### ADMIRAL FINANCIAL CORPORATION,
#### Plaintiff,

#### and

### Federal Deposit Insurance Corporation,
#### Plaintiff–Appellant,

#### v.

### UNITED STATES, Defendant–Appellee.

#### No. 02–5079.

United States Court of Appeals, Federal Circuit.

June 2, 2003.

John V. Thomas, Associate General Counsel, Federal Deposit Insurance Corporation, Legal Division, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Dorothy Ashley Doherty, John M. Dorsey, III; and John F. Elmore, FCIC, of Dallas Texas. Of counsel were Thomas D. Luck, FDIC, Washington, DC; and Ellis Merritt, Jr., FDIC, Dallas, TX.

William F. Ryan, Trial Attorney, Commercial Litigation Branch, Civil Division,

Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; and Arlene Pianko Groner, F. Jefferson Hughes, and Daniel D. McClain, Trial Attorneys. Of counsel was Michael M. Duclos, Trial Attorney.

Before MAYER, Chief Judge,
SCHALL, and DYK, Circuit Judges.

SCHALL, Circuit Judge.

The Federal Deposit Insurance Corporation ("FDIC") appeals the decision of the United States Court of Federal Claims that dismissed it from this *Winstar*-related action for lack of standing based on our decision in *Landmark Land Co., Inc. v. United States*, 256 F.3d 1365 (Fed.Cir. 2001) ("*Landmark*"). *Admiral Fin. Corp. v. United States*, 51 Fed. Cl. 366, 367 (2002). We affirm.

## BACKGROUND

### I.

This and other *Winstar*-related cases involve claims against the government stemming from the "thrift" crisis of the early 1980s. The background and history of that crisis and the government's subsequent enactment of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (1989), have been thoroughly discussed in the decision of the Supreme Court in *United States v. Winstar Corp.*, 518 U.S. 839, 843–58, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), and in a number of decisions of this court, including, *Landmark, Glass v. United States*, 258 F.3d 1349 (Fed.Cir.2001), *California Federal Bank, FSB v. United States*, 245 F.3d 1342 (Fed.Cir.2001), and *Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374 (Fed.Cir.2001). It is not necessary for us to expand upon these very thorough decisions; accordingly, we limit our discussion in this opinion to the specific circumstances relevant to this appeal.

In the 1980s, the Federal Savings and Loan Insurance Corporation ("FSLIC")[1] provided certain economic incentives to encourage private investors to purchase struggling savings and loans institutions, or "thrifts." This policy represented an attempt to avoid having the government liquidate struggling thrifts and being forced to use FSLIC funds to reimburse depositors. FSLIC's primary inducement to potential thrift purchasers was a partial forbearance from regulatory capital requirements. FSLIC accomplished this by allowing the thrift purchaser to treat the thrift's asset shortfall as a fictional asset. In other words, the difference between the thrift's assets and liabilities was "transformed," under FSLIC regulations, into an asset in an amount equal to the difference between the assets and liabilities. For example, if a thrift had $80 in assets and $100 in liabilities, FSLIC would allow the

1. FSLIC was a product of the Great Depression. In response to that financial crisis, Congress passed three statutes in an attempt to stabilize the thrift industry. The first was the Federal Home Loan Bank Act, which created the Federal Home Loan Bank Board ("Bank Board"). The Bank Board was authorized to channel funds to thrifts for loans on houses and for preventing foreclosures. Ch. 522, 47 Stat. 725 (1932) (codified, as amended, at 12 U.S.C. §§ 1429–1449 (1988)). The second statute was the Home Owners' Loan Act of 1933, which authorized the Bank Board to charter and regulate federal savings and loan associations. Ch. 46, 48 Stat. 128 (1933) (codified, as amended, at 12 U.S.C. §§ 1461–1468 (1988)). Finally, the National Housing Act created FSLIC, putting it under the authority of the Bank Board and giving it responsibility for insuring thrift deposits and regulating all federally insured thrifts. Ch. 847, 48 Stat. 1246 (1934) (codified, as amended, at 12 U.S.C. §§ 1701–1750g (1988)).

thrift's purchaser to allocate the $20 short-fall in real assets to a fictional asset called "supervisory goodwill." FSLIC then permitted this "supervisory goodwill" to be included among the assets that the purchaser could use to meet regulatory capital maintenance requirements under FSLIC regulations. "Supervisory goodwill" was to be amortized over a long period, thereby allowing the thrift's purchaser to contribute far less in actual capital to the thrift. These forbearance policies typically were memorialized in a forbearance letter pursuant to an agreement between FSLIC, on behalf of the government, and the thrift institution. *See generally California Federal Bank,* 245 F.3d at 1345. Because of these policies, failing thrifts became far more attractive as investments to potential purchasers, without any additional cost to FSLIC.

The regulatory policies undertaken by FSLIC were not successful in resolving the thrift crisis, however. *See Winstar,* 518 U.S. at 856, 116 S.Ct. 2432. As a result, on August 9, 1989, Congress enacted FIRREA. FIRREA made dramatic changes in the thrift industry. *See id.* at 856, 116 S.Ct. 2432. Among other things, these changes phased out the inclusion of "supervisory goodwill" in the calculation of regulatory capital and imposed upon thrifts additional capital requirements. This change in the method of calculating regulatory capital was especially problematic for purchasers of thrifts who had used the fictional asset of "supervisory goodwill" to meet their regulatory capital requirements under regulatory capital maintenance agreements signed with the government.

FIRREA also changed the structure of the government's regulation of the thrift industry. Under FIRREA, FSLIC was abolished and its functions transferred to other agencies, while a new thrift deposit insurance fund under the management of the FDIC was created. At the same time, FIRREA replaced the Bank Board with the Office of Thrift Supervision ("OTS"), an office within the Treasury Department responsible for the regulation of all federally insured savings associations. Finally, the Resolution Trust Corporation ("RTC") was created to manage and liquidate or otherwise dispose of failed thrifts. *See Winstar,* 518 U.S. at 856, 116 S.Ct. 2432. Until it went out of existence on December 31, 1995, *see* 12 U.S.C. § 1441a(m)(1), the RTC operated in two capacities: (1) RTC–Receiver and (2) RTC–Corporate. The task of the RTC in its receiver capacity was to wind up the business affairs of failed thrifts. *Winstar,* 518 U.S. at 856, 116 S.Ct. 2432. One of the things that RTC–Receiver did after a thrift failed was to convey to RTC–Corporate, by contract of sale, certain assets of the thrift. *Landmark,* 256 F.3d at 1371 n. 1. In that way, RTC Corporate assumed all of the failed thrift's legal claims, formerly held by RTC–Receiver. *Id.*

The thrift deposit insurance fund managed by the FDIC was given the name "FSLIC Resolution Fund" ("FRF"). Upon passage of FIRREA, the assets of FSLIC were placed in FRF. *Landmark,* 256 F.3d at 1381. In 1995, FRF received the assets and liabilities of the RTC. *Id.* at 1371 n. 1, 1381. The liabilities of the RTC, as successor to FSLIC, included the obligation to pay breach of contract claims against FSLIC. *Id.* at 1381. The assets of the RTC included the right to repayment of payments made to insured depositors when the RTC paid insured depositors of a failed thrift. By making such payments, the RTC became "subrogated to all rights of the depositor against [the failed thrift] to the extent of such payment or assumption." 12 U.S.C. § 1821(g). The assets of FSLIC were placed in an account maintained as FRF–FSLIC. *Id.* § 1821a. The assets of the RTC were placed in an

account maintained as FRF–RTC. *Id.* § 1441a(m).[2] Therefore, a claim asserted by a thrift that had failed as a result of FIRREA's capital requirements resulted in the FDIC, as manager of FRF, asserting the claim as an asset of FRF–RTC against FSLIC, the governmental party to the original contract between the United States and the failed thrift. *Landmark,* 256 F.3d at 1371 n. 1. Any award constituted an FSLIC liability and would be paid out of FRF–FSLIC. Consequently, the net effect of any damage award to the FDIC on behalf of the failed thrift would result in a transfer of funds from FRF–FSLIC to FRF–RTC.

In due course, OTS issued regulations implementing FIRREA's capital requirements, along with a bulletin that stated that "FIRREA 'eliminates [capital and accounting] forbearances' previously granted to certain thrifts." *Winstar,* 518 U.S. at 857, 116 S.Ct. 2432 (quoting Office of Thrift Supervision, *Capital Adequacy: Guidance on the Status of Capital Accounting Forbearances and Capital Instruments Held by a Deposit Insurance Fund,* Thrift Bulletin No. 38–2, Jan. 9, 1990). As a result of the new capital compliance standards, many thrifts immediately fell out of capital compliance, making them subject to immediate seizure by the thrift regulators. *Id.* at 857–88, 116 S.Ct. 2432. Ultimately, the Supreme Court held that the government breached its contracts with several financial institutions, and their investors, by enacting FIRREA. *Id.* at 843, 116 S.Ct. 2432.

After the enactment of FIRREA, the RTC commonly advanced failing thrifts sufficient money to pay off their depositors upon liquidation. This resulted in the RTC, and, after termination of the RTC in 1995, FRF–RTC becoming a "priority" creditor of failed thrifts. That is because under the statutory scheme of priority for thrift creditors, the FDIC is obligated to completely satisfy the claim of the government, specifically that of FRF–RTC, against the failed thrift for reimbursement of deposit liability before distributing any proceeds to the failed thrift's other creditors. 12 U.S.C. § 1821(d)(11) (1988).[3]

## II.

The facts of this case are as follows. In 1987, Admiral Financial Corporation ("Admiral") approached Haven Federal Savings and Loan Association ("Old Haven")

---

2. The FDIC, as manager of FRF, has maintained the two sets of assets as distinct funds, FRF–FSLIC and FRF–RTC. *See* Federal Deposit Insurance Corporation General Counsels Opinion No. 9; FICO Funding Sources, 61 Fed.Reg. 45,970, 45,971–73 (Aug. 30, 1996).

3. The priority of creditors of thrifts placed in receivership is as follows:

(A) Subrogated claims; claims of uninsured depositors and other creditors
The receiver shall—
(i) retain for the account of the Corporation such portions of the amounts realized from any liquidation as the Corporation may be entitled to receive in connection with the subrogation of the claims of the depositors; and

(ii) pay to depositors and other creditors the net amounts available for distribution to them.
12 U.S.C. § 1821(d)(11) (1988). "Corporation" refers to the RTC. *See* 12 U.S.C. 1441a(a)(2) (Supp. II 1990).
The current version of section 1821(d)(11) does not apply to this case. The Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66, § 3001(c), 107 Stat. 312 (Aug. 10, 1993), states that the "amendments made by this section [including amendments to section 1821(d)(11)] shall apply with respect to insured depository institutions for which a receiver is appointed after the date of enactment of this act." *Id.* at 336–37. As noted below, the RTC was appointed receiver for the failed thrift in this case prior to 1993. Thus, the earlier version of section 1821(d)(11) applies in this case.

with a proposal to form a new thrift institution. Under the proposal, Admiral would acquire Old Haven through a transaction in which all of Old Haven's issued and outstanding stock would be exchanged for stock of Admiral. On August 6, 1987, Admiral and Old Haven executed an Agreement and Plan of Reorganization. On April 26, 1988, the Bank Board conditionally approved Admiral's application to acquire Old Haven. In that connection, the Bank Board sent a letter to Admiral's counsel authorizing the new thrift ("Haven") to amortize any intangible asset (such as goodwill) "over a period not to exceed 25 years by the straight-line [accounting] method." Thereafter, on June 15, 1988, Admiral and FSLIC entered into a Regulatory Capital Maintenance/Dividend Agreement ("RCMA"). Under the agreement, Admiral was required to ensure that Haven's regulatory capital was maintained at certain specified levels. From its inception, however, Haven lost money and fell out of capital compliance on March 31, 1989, causing Admiral to be in default on its obligations under the RCMA.

By December 31, 1989, Haven was insolvent by approximately $1.4 million. On March 1, 1990, OTS closed Haven for failure to meet the regulatory capital requirements mandated by FIRREA and appointed the RTC as receiver for Haven. As Haven's receiver, the RTC succeeded to all of Haven's assets, including any legal claims that Haven possessed. On March 2, 1990, OTS created a new institution called Haven Federal Savings and Loan Association, F.A. ("Haven Federal"); pursuant to a purchase and assumption agreement, Haven Federal received all of the assets and most of the liabilities resulting from the Haven receivership.

The RTC operated Haven Federal in conservatorship until December 7, 1990, at which time OTS appointed RTC receiver for the purpose of liquidating Haven Federal's assets. As receiver, the RTC immediately sold certain assets and transferred all Haven Federal deposits to Barnett Federal Savings and Loan Association ("Barnett"). In connection with that transaction, RTC–Receiver advanced sufficient funds to Haven Federal to enable it to compensate Barnett for the difference between Haven Federal's assets and liabilities, at a cost to the RTC of approximately $32,600,000. The money advanced to Haven Federal was required to induce Barnett to assume Haven Federal's deposit liabilities. Because of this cash advance for depositor liability, the RTC became the "priority" creditor of Haven Federal in the amount of $32,871,148. That same day, RTC–Receiver sold other assets of Haven Federal (including all legal claims) to RTC–Corporate. When the RTC went out of existence, all assets and liabilities it held in its corporate capacity were transferred to FRF–RTC. 12 U.S.C. § 1441a(m)(1), (2).

### III.

On August 5, 1993, Admiral filed suit against the United States in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a)(1). In its complaint, it alleged that the enactment and implementation of FIRREA breached the government's contract with Admiral, in which the government (i) agreed to allow Haven to count supervisory goodwill toward its regulatory capital for the purpose of meeting regulatory capital maintenance requirements and (ii) agreed to allow Haven to amortize that capital over a period not to exceed 25 years.[4]

---

4. Admiral also alleged that FIRREA resulted in a taking of contractual rights without just compensation and a taking of the property that Admiral contributed to Haven without just compensation.

It is Admiral's contract claim that is at issue in this case. Admiral alleges that "[t]he provisions of FIRREA restricting the inclusion of supervisory goodwill for purposes of satisfying minimum capital requirements constitute a repudiation or breach of Admiral's contract rights ... for which Admiral claims it is entitled to monetary relief in the form of damages or restitutionary relief." Admiral also alleges that

[t]he regulatory forbearances granted by the government which permitted the inclusion of supervisory goodwill for purposes of satisfying minimum capital requirements were essential terms and conditions of [Admiral's] agreement to acquire and recapitalize Haven. Because the capital requirements of FIRREA abrogated and superseded these contractual obligations, that statute effected a complete frustration of the agreement and a failure of the consideration for which [Admiral] bargained.

Under its breach of contract claim, Admiral initially sought recovery of $27,273,653. That amount had several components. The first was the sum of $14,705,590 in restitution, representing the excess of Old Haven liabilities over Old Haven assets that Admiral said it assumed when it purchased Old Haven. According to Admiral, through its assumption of these liabilities, it relieved the government from having to pay them. Second, Admiral claimed that it was entitled to recover a total of $11,483,563, representing added capital infusions into Haven. In addition, it asserted entitlement to $1,084,500 in acquisition costs associated with the acquisition of Old Haven. Admiral subsequently adjusted its breach of contract claim to seek total restitution in the amount of $14,395,075, comprised of $11,072,075, representing capital

contributions to Haven, and $3,323,000, representing the amount that Admiral claims it saved the government by delaying the need to liquidate Old Haven. Finally, Admiral seeks $644,670 reliance damages for amounts it alleges it expended in performance of, and in preparing to perform, its contractual obligations. Thus the total amount of recovery being sought by Admiral is $15,039,745.

## IV.

Eventually, the FDIC moved to intervene in the suit and, in the alternative, to be substituted as plaintiff in place of Admiral. The Court of Federal Claims granted the FDIC's motion to intervene but denied its motion to be substituted for private plaintiffs. *Plaintiffs in All Winstar–Related Cases at Court,* 44 Fed. Cl. 3, 5–12 (1999).[5] The court concluded that "the FDIC's interests were not adequately protected by the existing parties." *Id.* at 8.

Subsequently, on March 26, 1997, the FDIC filed its complaint, asserting the following four claims against the United States: (1) a taking of property without just compensation; (2) a deprivation of property without due process of law; (3) breach of contract; and (4) frustration of purpose. The FDIC claimed that it was asserting these claims "as successor to the rights of Haven Federal Savings and Loan Association and as manager of the FSLIC Resolution Fund that succeeded by operation of law to the assets and liabilities of the Resolution Trust Corporation ('FRF–RTC')". FDIC Complaint at 1. The FDIC states that it seeks to recover the cash equivalent value of Haven's lost right to count supervisory goodwill as capital ($8.1 million). In addition, the FDIC asserts that, as successor to the interests of Ha-

---

**5.** The FDIC was granted the right to intervene in thrity-six *Winstar* cases and was granted the right to be substituted for the party-plaintiff (i.e., the failed thrift) in seven other *Winstar* cases.

ven, it is the proper owner of the $14,395,075 restitution claim asserted by Admiral.

## V.

In due course, the government moved to dismiss the FDIC on the grounds that its claims were non-justiciable and not timely filed. While the motion was pending, this court decided *Landmark*. Like the present litigation, *Landmark* was a *Winstar*-related case. In 1982, Landmark entered into a contract (the "Assistance Agreement") with FSLIC to acquire two failing thrifts: Dixie Federal Savings and Loan Association ("Dixie") and Heritage Federal Savings and Loan Association ("Heritage"). *Landmark*, 256 F.3d at 1370. Under the Assistance Agreement, Landmark was required to make an initial capital contribution "of not less than $20,000,000." Landmark did this by contributing real estate and cash valued at $21.5 million. In exchange for the capital contribution, FSLIC agreed to allow Dixie, the thrift surviving the merger, to treat its shortfall in actual assets as supervisory goodwill, which could be applied to its regulatory capital maintenance requirements. *Id.* In order to maintain Dixie's financial strength as the value of the goodwill was reduced through amortization, the Assistance Agreement required Landmark to make additional capital contributions to Dixie as necessary to maintain Dixie's net worth at not less than three percent of its liabilities. *Id.* In 1986, Dixie and the government entered into an agreement under which Dixie acquired another thrift, St. Bernard Federal Savings and Loan Association ("St.Bernard"). *Id.* at 1371. Dixie then merged with St. Bernard. *Id.* The merged thrift, however, went bankrupt, was seized by federal regulators, and was placed in receivership, with the RTC acting as receiver. *Id.*

Eventually, Landmark brought suit in the Court of Federal Claims, alleging that,

through FIRREA, the government had breached the Assistance Agreement. *Id.* In its action, Landmark sought, as damages, compensation for the assets that it contributed to Dixie in 1982 and 1983, as well as "use value" as compensation for the loss Landmark allegedly suffered by reason of not being able to use those assets after contributing them to Dixie. *Id.* The Court of Federal Claims granted the FDIC's motion to intervene, as Dixie's successor in interest, so that it could assert claims to recover Dixie's 1986 contribution to St. Bernard and the unamortized portion of Dixie's goodwill that had been created by the Assistance Agreement and subsequently eliminated by FIRREA. *Id.* In due course, the court granted Landmark's and the FDIC's motions for summary judgment against the government on the issues of liability for breach of the Assistance Agreement and the 1986 contract under which Dixie acquired St. Bernard. *Id.* After a trial on damages, the court awarded Landmark $21.5 million for its 1982 contribution under the Assistance Agreement and the FDIC $17.1 million in restitution for the breach of the 1986 contract. *Id.* The court concluded that $17.1 million was the value of the benefit that Dixie had provided to the government in connection with its acquisition of St. Bernard. *Id.*

On appeal, the government argued that the Court of Federal Claims erred in awarding damages to Landmark. More importantly for present purposes, it also argued that the FDIC's claims had to be dismissed. The government urged that the claims did not satisfy the case-or-controversy requirement because the government and the FDIC were not adverse parties as to those claims. *Id.* at 1380.

Although we affirmed the Court of Federal Claims' award of damages to Landmark, we agreed with the government that

the claims raised by the FDIC failed to satisfy the case-or-controversy requirement of Article III, Section 2 of the Constitution. We began our analysis with the proposition that, "[i]n order for a plaintiff's claim to satisfy the case or controversy requirement, resolution of that claim must affect 'the legal relations of parties having adverse legal interests.'" *Landmark*, 256 F.3d at 1380 (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937)). We determined that the case-or-controversy requirement had not been satisfied because the FDIC was not adverse to the United States with respect to the claims that it asserted on behalf of Dixie. *Id.* We stated:

> It is undisputed that no private creditors could benefit even if the FDIC were to fully recover on its claims in this case. That is because, under the statutory scheme of priority for thrift creditors, the FDIC is obligated to completely satisfy the claim of the government, specifically that of the FSLIC Resolution Fund ("FRF"), against [the failed thrift] before distributing any proceeds to [the failed thrift's] other creditors. *See* 12 U.S.C. § 1821(d)(11) (1994). It is undisputed that [the failed thrift] owes the FRF over $1.5 billion for the advances that the FRF made to [the failed thrift's] depositors upon its liquidation. The claims asserted by the FDIC in this case total only $674.2 million. Thus, even if the FDIC were to have won a judgment for the entire amount it was seeking . . ., none of the money paid by the government in satisfaction of such a judgment would leave the government. That is because the government holds a claim against [the failed thrift] for an even greater amount . . . paid by the RTC to [the failed thrift's] depositors upon [the failed thrift's] liquidation. Nor would adjudication of the FDIC's claims affect [the failed thrift's] other creditors. For these reasons, the

FDIC's claims do not give rise to an actual case or controversy because the FDIC and the government are not truly adverse as to the FDIC's claims. Therefore, the FDIC lacks standing, and its claims must be dismissed.

*Id.* Concluding, we held that "where the FDIC has not asserted claims for recovery in excess of what the failed thrift owes to the government, the case-or-controversy requirement is not satisfied." *Id.* at 1382. Accordingly, we reversed the Court of Federal Claims' summary judgment of liability as to the FDIC's claims, and remanded for the dismissal of the FDIC from the case. *Id.*

On January 10, 2002, the Court of Federal Claims granted the government's motion in this case and dismissed the FDIC as a party. The court noted that in *Landmark*, the FDIC was dismissed for lack of standing because Article III, Section 2 of the Constitution confines judicial power to cases and controversies between adverse parties. The court pointed out that the *Landmark* court held that "[t]here is no case-or-controversy where, as here, the Government, in the guise of the FDIC, is suing the Government, in the guise of the FDIC, and recovery from the United States benefits the United States." *Admiral*, 51 Fed. Cl. at 367. The court stated that in order for the FDIC to avoid this result, "the FDIC must seek a dollar recovery that repays the FSLIC Resolution Fund (FRF) and still provides additional amounts to pay other non-governmental creditors." *Id.* In other words, the FDIC's claim must be greater than the government's claim against the failed thrift in order to avoid the result of the government suing itself for damages that it claims it owes itself.

The Court of Federal Claims reasoned that since the FDIC claims only $8,100,000 in damages on behalf of Haven, no party

other than the government will be affected by the FDIC's claim, because even a full recovery on that claim would be less than the amount of the FDIC's priority FRF–RTC claim of $32,871,148. This was so, the court observed, even if the restitution claims asserted by Admiral—which the FDIC says only it can assert as derivative claims—were added to the FDIC's claim:

> Finally, there appear to be no disputed or overlapping claims. Admiral has represented that its claims are direct claims against the United States for breach of Admiral's contract and property rights, not those of any other party; it does not bring any claims on behalf of Haven. Admiral has also expressly disavowed any intention to pursue lost profits. And although Admiral's restitution theory may share the supervisory goodwill component of a potential Haven claim, Admiral's cause of action is independent of any claim that could have been brought by Haven. In any event, even if that claim is properly the FDIC's, adding the $14 million Admiral claims to the $8.8 million [$8.1 million without interest] currently sought would still not exceed the amount of the FDIC's subrogated claim. Therefore, the FDIC cannot establish standing under *Landmark*
> . . . .

*Admiral,* 51 Fed Cl. at 368. The trial court determined that because the FDIC's claim would simply funnel money from one FDIC subaccount to another (i.e., from FRF–FSLIC to FRF–RTC), the FDIC was not adverse to the United States as defendant. In the alternative, the trial court held that the FDIC's complaint was not timely filed under 28 U.S.C. § 2501, the governing statute of limitations under the Tucker Act, because it was filed on March 26, 1997, more than six years after August 9, 1989, the effective date of FIRREA. *Admiral,* 51 Fed. Cl. at 368–69. The court rejected the FDIC's arguments that the statute of limitations had been

waived, or tolled, and that its untimely complaint related back to Admiral's timely filed complaint. *Id.* at 368.

Accordingly, the Court of Federal Claims granted the government's motion to dismiss the FDIC's claim for lack of standing and dismissed the FDIC's complaint. The FDIC now appeals.

## ANALYSIS

### I.

The government argues first that we should dismiss the FDIC's appeal for lack of standing because the FDIC does not raise claims involving an adverse party. The government points to our statement in *Landmark* that, "[i]n order for a plaintiff's claim to satisfy the case-or-controversy requirement, resolution of that claim must affect the 'legal relations of parties having adverse legal interests.'" 256 F.3d at 1380 (quoting *Aetna Life Ins.,* 300 U.S. at 240, 57 S.Ct. 461). According to the government, on appeal, the FDIC is not raising any issues that implicate the "legal relations" between it and the United States, the purported adverse party. Rather, the government maintains, "the FDIC's appeal relates solely to a dispute between it and its co-plaintiff, Admiral, concerning 'ownership' of a theory of recovery." The government takes the position that since the FDIC does not dispute the Court of Federal Claims' holding that, as far as its claim is concerned, it failed to present a justiciable claim, the FDIC's sole remaining dispute is with Admiral and concerns ownership of the claims being advanced by Admiral. In the alternative, the government argues that the FDIC lacks standing because, regardless of our decision, dismissal of its complaint is inevitable. The government notes that the amount of recovery sought in Admiral's restitution theory ($14,395,075) is less than the government's priority claim against Haven.

■ We do not agree with the government's argument. Pursuant to 28 U.S.C. § 1295(a)(3), we have jurisdiction over "an appeal from a final decision of the United States Court of Federal Claims." The Court of Federal Claims dismissed the FDIC's appeal for lack of standing and entered judgment pursuant to RCFC 54(b). The FDIC now appeals from that judgment. We have jurisdiction to determine whether the Court of Federal Claims' dismissal for lack of jurisdiction was proper. Acceptance of the government's argument would mean that a decision by the Court of Federal Claims dismissing the FDIC from a *Winstar* case under circumstances similar to those here would be immune from review. The government's jurisdictional argument really speaks to the merits of the standing issue. It is to the merits that we now turn.

## II.

■ A dismissal for failure to meet the case-or-controversy requirement of Article III, Section 2 of the Constitution is a dismissal for lack of jurisdiction. *Vt. Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 770, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (holding that the first step is to "address the jurisdictional question whether [respondent] has standing under Article III of the Constitution to maintain this suit"). We review without deference a decision by the Court of Federal Claims that it lacks jurisdiction in a particular case. *Wheeler v. United States,* 11 F.3d 156, 158 (Fed.Cir.1993) (stating that we "review[ ] *de novo* whether the Court of Federal Claims possessed jurisdiction ... as [it is a] question[ ] of law").

We agree with the Court of Federal Claims that this case is controlled by our decision in *Landmark.* The FDIC's claim against the United States is in the amount of $8,100,000. For its part, as seen above, Admiral is seeking to recover from the

United States, as restitution, a total of $14,395,075, as well as reliance damages of $644,670 it claims to have expended in preparing to perform, and in performing, its contractual obligations, for a total recovery of $15,039,745. The FDIC asserts that Admiral's restitution claim is in fact derivative and belongs to the FDIC as successor to the rights of Haven. If the amount of Admiral's restitution claim, $14,395,075, is added to the $8,100,000 that the FDIC is seeking to recover in its derivative claim on behalf of Haven, the resulting sum is $22,495,075. At the same time, the Haven receivership owes the FRF, as a priority claim, more than $32,871,148, for the advances that the RTC made to Haven Federal so that Haven Federal could compensate Barnett for assuming Haven Federal deposit liabilities that exceeded Haven Federal assets.

In short, it is clear that no private creditors could benefit even if (i) the FDIC were to recover on its claim of $8.1 million against the United States and (ii) the restitution claim asserted by Admiral against the United States was deemed to be owned by the FDIC and the FDIC were to recover the total amount of the claim. That is because the undisputed priority claim of FRF still would exceed the claims being asserted by the FDIC by more than $10 million. Thus, assuming that the FDIC were to fully recover, all proceeds from the judgment would be paid out of the FRF, and then distributed by the FDIC right back into the FRF on the basis of the statutory order of priorities, since the government is the "priority" creditor. In other words, whether or not the FDIC's claims are adjudicated, they cannot affect any party other than the government because the amount that the FDIC alleges as damages is less than the amount that the failed thrift owes the government. Under these circumstances, this case is controlled by our holding in *Landmark* that "where the FDIC has not asserted claims for re-

covery in excess of what the failed thrift owes to the government, the case-or-controversy requirement is not satisfied." 256 F.3d at 1382.

The FDIC urges, however, that the claims being asserted by Admiral are in fact derivative claims of Haven that can only be properly asserted by the failed thrift or its successor in interest, i.e., the FDIC. In addition, the FDIC maintains that *Landmark* does not control this case because in *Landmark* all of the parties had a chance to be heard, and all of the claims were resolved through a full damages trial. By contrast, in this case, the FDIC asserts, its claims were dismissed without a determination as to the ownership of the claims being asserted by Admiral.

■ We are not persuaded by the FDIC's arguments. First, it is clear that the United States can properly assert any bars to recovery that the FDIC could have asserted against Admiral (e.g., that Admiral's claims are in fact owned by, or assertable only by, the FDIC). Second, and most importantly, the FDIC ignores the holding of *Landmark*: "where the FDIC has not asserted claims for recovery in excess of what the failed thrift owes to the government, the case-or-controversy requirement is not satisfied." *Id.* Under the holding in *Landmark*, in a case such as the present one, the critical question is whether claims being asserted by the FDIC and claims being asserted by the plaintiff—

which the FDIC asserts are derivative claims—total less than the government's priority claim arising from advances made to satisfy deposit liabilities of the failed thrift. If they do, the case-or-controversy requirement is not met and the FDIC lacks standing. It is not necessary to determine the correct ownership of claims being asserted by the plaintiff that the FDIC asserts it owns as the successor to the failed thrift. That is the case here. The claims the FDIC is asserting, its $8,100,000 claim as successor to Haven and Admiral's $14,039,075 restitution claims, with respect to which it asserts ownership, total less than the government's priority claim.

We hold that, because the sum of (i) the FDIC's claim and (ii) Admiral's restitution claims that the FDIC asserts it owns is less than the amount the failed thrift owes to the government, the case-or-controversy requirement is not satisfied as to the FDIC. Accordingly the Court of Federal Claims did not err in dismissing the FDIC for lack of standing.[6]

### CONCLUSION

For the foregoing reasons, the decision of the Court of Federal Claims dismissing the FDIC for lack of standing is *AFFIRMED*.

---

6. Because we hold the case-or-controversy requirement was not met, it is not necessary for us to reach the statute of limitations issue.